People v Rogers (2018 NY Slip Op 00046)





People v Rogers


2018 NY Slip Op 00046


Decided on January 4, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 4, 2018

108775

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
KEVIN ROGERS, Appellant.

Calendar Date: November 13, 2017

Before: Garry, P.J., Clark, Mulvey, Aarons and Rumsey, JJ.


Trevor W. Hannigan, Albany, for appellant.
Eric T. Schneiderman, Attorney General, New York City (James F. Gibbons of counsel), for respondent.


Garry, P.J.

MEMORANDUM AND ORDER
Appeal from a judgment of the County Court of Rensselaer County (Young, J.), rendered September 23, 2016, upon a verdict convicting defendant of the crime of grand larceny in the third degree.
In May 2010, a State Police investigator (hereinafter the investigator) commenced an investigation of alleged drug trafficking by correction officers at the Rensselaer County Jail. The investigator thereafter also began looking into the possible misuse of funds by officials of the correction officers' union, the Sheriff's Employees Association of Rensselaer County (hereinafter SEARCO). Defendant, a correction officer at the jail, was not a target of the drug investigation. However, as the vice-president of SEARCO, he and the union president, Mark
Piche, subsequently became targets of the SEARCO inquiry.
In early 2011, the Rensselaer County District Attorney recused himself, and both investigations were taken over by the US Attorney's office for the Northern District of New York. The drug investigation terminated in November 2011, but an extensive investigation of SEARCO's finances continued. In September 2013, Piche pleaded guilty to a federal tax felony pursuant to an agreement that he would testify against defendant. A federal grand jury was convened in 2014, but defendant was not indicted. Federal prosecutors subsequently determined that defendant's activities did not constitute federal offenses, and the Attorney General's office took over the prosecution.
Defendant was indicted on four charges arising out of the SEARCO investigation in October 2015. He moved to dismiss the indictment on several grounds. County Court conducted a Singer hearing to determine whether there was good cause for the delay in prosecution and denied the motion. After a jury trial, defendant was convicted of grand larceny in the third degree [FN1]. County Court denied defendant's two CPL 330.30 motions to set aside the verdict, conducted a restitution hearing, sentenced defendant to 60 days in prison and five years of probation, and ordered him to pay $10,979.14 in restitution. Defendant appeals.
County Court correctly declined to dismiss the indictment on the ground that the Attorney General's office lacked jurisdiction to prosecute defendant. County Law § 700 (1) confers the duty and authority to conduct criminal prosecutions upon county district attorneys, and the Attorney General has prosecutorial power only "when specifically authorized by statute" (People v Gilmour, 98 NY2d 126, 131 [2002] [internal quotation marks, emphasis and citations omitted]; see People v Cuttita, 7 NY3d 500, 507 [2006]). Such authority is provided by Executive Law § 63 (3), which states, as pertinent here, that upon the request of "the head of any . . . department, authority, division or agency of the state," the Attorney General may investigate and prosecute potentially illegal activity that falls within the authority of the officer who made the request. These statutory requirements were met by a May 2015 letter from the Superintendent of the State Police that asked the Attorney General to review and, if appropriate, prosecute the SEARCO matter (see People v Miran, 107 AD3d 28, 35 [2013], lv denied 21 NY3d 1044 [2013], cert denied ___ US ___, 134 S Ct 2312 [2014]; People v Stuart, 263 AD2d 347, 348-349 [2000]). Contrary to defendant's argument, the prosecutorial authority established by this request was not negated because the Attorney General's staff had previously reviewed investigation files, spoken with participants in the federal investigation and informed the investigator that a referral pursuant to Executive Law § 63 (3) was required (see People v Codina, 297 AD2d 539, 541 [2002], lv denied 98 NY2d 767 [2002]; Matter of L & S Hosp. & Inst. Supplies Co. v Hynes, 84 Misc 2d 431, 435-436 [1975], affd 51 AD2d 515 [1976]).
We reject defendant's contention that the indictment should have been dismissed on the ground that the prosecution was not commenced within the five-year limitations period applicable to grand larceny in the third degree (see CPL 30.10 [2] [b]; Penal Law § 155.35). "It is well settled that grand larceny may be charged as a series of single larcenies governed by a common fraudulent scheme or plan even though the successive takings extended over a long period of time" (People v Arnold, 15 AD3d 783, 785 [2005] [internal quotation marks and citations omitted], lv denied 4 NY3d 851 [2005]; see People v Cox, 286 NY 137, 142-143 [1941]). When so charged, grand larceny is a continuing crime, and the statute of limitations begins to run upon the commission of the last offense in the series (see People v Perry, 114 AD3d 1282, 1283 [2014], lv denied 22 NY3d 1201 [2014]; People v Arnold, 15 AD3d at 785; see also People v Scanlon, 52 AD3d 1035, 1037 [2008], lv denied 11 NY3d 741 [2008]; People v DeBeer, 35 AD3d 1275, 1276 [2006], lv denied 8 NY3d 921 [2007]).
The proof established that Piche and defendant were named as SEARCO's senior officers shortly after they formed SEARCO with a third individual in 2004 [FN2]. SEARCO members [*2]paid dues to the union via mandatory paycheck deductions, and the funds were deposited into a SEARCO bank account. Piche and defendant were the only signatories on this account and were both issued debit cards. Piche testified that he and defendant used this account to pay for such SEARCO expenditures as legal fees, expenses related to SEARCO operations and meetings, and charitable donations. Piche wrote checks to cover these expenses and never used his debit card. Defendant used his debit card, sometimes in Piche's presence. In 2009, Piche reviewed the bank statements and noticed that defendant's debit card had been used for "a lot of expenditures." The People assert that defendant used the debit card on multiple occasions between 2006 and 2009 for restaurant meals, cash withdrawals and other transactions for his own benefit rather than SEARCO purposes.
After a discussion with SEARCO's counsel, Piche transferred the union funds to another account where defendant had no check-signing privileges and no debit cards were issued. Defendant continued to make charitable donations on SEARCO's behalf by requesting checks from Piche, who testified that he sometimes signed blank checks for this purpose and gave them to defendant to complete. Defendant requested two such checks in July 2010 and January 2011, telling Piche that they were for donations to support the career of a local boxer. Piche signed the checks and gave them to defendant without filling in the payee's name, and defendant made them out to an organization called Pugnacious Promotions, the first in the amount of $1,200 and the second in the amount of $600. The People assert that Pugnacious Promotions was a for-profit business that organized boxing events but did not provide donations or individual sponsorships to boxers. They claim that defendant used the 2010 and 2011 checks for his own benefit to purchase ringside tables at boxing events.
We are unpersuaded by defendant's contention that the change in defendant's modus operandi to using checks to obtain SEARCO funds after he lost access to the debit card represented a new, separate scheme that cannot be aggregated with the previous offenses, and that the statute of limitations therefore began to run when defendant last used the debit card in December 2009. The indictment charged defendant with grand larceny in the third degree based on thefts from SEARCO between August 2006 and January 2011, and the People's theory as to all of the alleged thefts was that defendant relied upon his authority as a union official to access SEARCO funds that were intended to be used for union purposes, and used them instead to benefit himself. Each single larceny was alleged to be part of a common fraudulent scheme by which defendant made a series of thefts from the same owner for the same purpose. Thus, the offenses were properly aggregated as one continuing crime that terminated upon the last transaction in January 2011, and the action was timely commenced less than five years later with the filing of a criminal complaint in July 2015 (see CPL 1.20 [17]; People v Perry, 114 AD3d at 1283; People v Arnold, 15 AD3d at 785).
County Court properly denied defendant's motion to dismiss the indictment on the ground that his due process rights were violated by the delay between the 2011 commencement of the SEARCO investigation and defendant's 2015 indictment. A defendant's due process rights are violated when preindictment delay is unjustified (see People v Decker, 13 NY3d 12, 14 [2009]; People v Lesiuk, 81 NY2d 485, 490 [1993]). Where, as here, the delay is protracted, the burden is on the People to establish good cause (see People v Decker, 13 NY3d at 14; People v Singer, 44 NY2d 241, 254 [1978]; People v Montague, 130 AD3d 1100, 1101 [2015], lv denied 26 NY3d 1090 [2015]). "[T]he relevant factors include the extent of the delay, reason for the delay, nature of the underlying charges, any extended pretrial incarceration and any indications of [*3]prejudice or impairment to the defense attributable to the delay" (People v Ruise, 86 AD3d 722, 722-723 [2011] [internal quotation marks and citation omitted], lv denied 17 NY3d 861 [2011]; see People v Vernace, 96 NY2d 886, 887 [2001]; People v Taranovich, 37 NY2d 442, 445 [1975]).
The SEARCO investigation was formally commenced in January 2011, when the State Police received a written complaint that SEARCO officials were misusing union funds. The delay of more than four years between this event and defendant's October 2015 indictment weighs in defendant's favor, but the other factors favor the People. Defendant was not incarcerated during this time period, and he does not assert that he was prejudiced by the delay. As for the nature of the crime, the allegations required a complex investigation and involved a serious abuse of the trust of SEARCO members over a significant time period.
The remaining factor of the reason for the delay must be scrutinized with particular care because the length was "extraordinary" (People v Chaplin, 134 AD3d 1148, 1149 [2015], lv denied 27 NY3d 1067 [2016]). The investigator testified that the drug investigation was already underway when the possible abuse of SEARCO funds was discovered, and that the drug allegations were initially given higher priority because they involved public safety concerns. Nevertheless, the investigator sent out subpoenas in the SEARCO investigation immediately after the written complaint was received. Shortly thereafter, due to concern about potential leaks, both investigations were transferred from the Rensselaer County District Attorney's office to the US Attorney's office. The investigator continued to advance the SEARCO inquiry by, among other things, involving other federal agencies and sending out additional subpoenas for pertinent financial records. The investigation required many witness interviews and the collection and analysis of voluminous bank records, receipts and other financial documentation. This time-consuming task was significantly complicated by defendant's failure to maintain accurate records, which required investigators to obtain documentation from the various vendors and reconstruct and analyze the transactions to determine which expenditures were related to SEARCO purposes (see People v Green, 52 AD3d 1263, 1264-1265 [2008], lv denied 11 NY3d 788 [2008]).
Piche's 2013 cooperation agreement provided significant assistance to the investigation, but did not lead to evidence supporting federal charges against defendant. The Attorney General's office took over the prosecution and began reviewing the federal investigatory materials after a sharing order was issued in December 2014. Following this review, the Attorney General's office advised the investigator in March 2015 that it intended to prosecute defendant and that a formal request pursuant to Executive Law § 63 (3) was required. The referral was provided in May 2015, the criminal action was commenced in July 2015, and defendant was indicted in October 2015. Considering the complexity of the required analysis, the initial priority given to the drug investigation for public safety reasons, and the importance of Piche's cooperation in developing the case against defendant, we find that the People established good cause for the delay in prosecution and that defendant's due process rights were not violated (see id.; see also People v Decker, 13 NY3d at 14-16; People v Chaplin, 134 AD3d at 1149-1150; People v Gaston, 104 AD3d 1206, 1206-1207 [2013], lv denied 22 NY3d 1156 [2014]).
Defendant's argument that state prosecutors could have exercised their concurrent jurisdiction to begin prosecuting defendant for state offenses while the federal investigation was ongoing disregards the fact that such an approach would have been highly impractical, as it would have required the People either to duplicate federal efforts or to proceed against defendant before the State Police investigation was complete and before Piche's cooperation was obtained. As neither state nor federal authorities engaged in any unreasonable delay, we find no merit in defendant's argument that state prosecutors should be charged with delay occasioned by the [*4]federal investigation as "coordinate arms of the state in the criminal law enforcement field" (People v Montague, 130 AD3d at 1102).
We reject defendant's contention that his conviction is not based upon legally sufficient evidence and is against the weight of the evidence. The voluminous records submitted by the People detailed multiple occasions between 2006 and 2009 when defendant's debit card was used at restaurants, bars and strip clubs, for purchases of liquor and for cash withdrawals. Piche testified that SEARCO routinely conducted its meetings and other union business in restaurants and bars at union expense, that he and defendant often used union funds to pay for restaurant meals and bar visits after they finished conducting union business or during meetings with SEARCO's counsel, and that union funds were also used to purchase food and beverages for union meetings. However, even after investigators excluded every transaction that could be correlated with such union-related activities and every transaction at which Piche recalled that he was present, thousands of dollars in unexplained transactions and cash withdrawals remained. SEARCO's accountant testified that he warned defendant in 2007 that debit cards and cash should not be used for SEARCO expenditures because of the lack of internal controls, and advised defendant to maintain thorough documentation of any such transactions that did occur. Nevertheless, undocumented debit card transactions and cash withdrawals continued to appear in the bank records. Notably, the People's evidence reveals that SEARCO's spending dropped sharply after defendant lost the use of the debit card, including much less frequent spending at bars and restaurants.
As for the two checks, Piche testified that SEARCO often used checks to make charitable donations, in amounts that typically ranged from $200 to $500. He believed that the signed check that he provided to defendant in June 2010 would be used to support a certain local boxer, did not know the check would be made out to Pugnacious Promotions, and did not learn until later that defendant had made it out in the amount of $1,200. As for the January 2011 check, the People placed into evidence a recorded telephone conversation in which defendant could be heard asking Piche for a $400 check because "[his] boxer [was] fighting." Piche protested that the boxer was not a charity and that defendant could not "just keep giving the guy . . . 400 bucks," but defendant responded that the boxer was a charity because he needed to raise money to fight. Despite Piche's testimony that defendant specifically requested the checks, SEARCO's accountant testified that when he asked defendant about the purpose of one of the Pugnacious Promotions checks, defendant claimed that he did not know what it was for.
The People presented evidence that Pugnacious Promotions organized boxing events in Saratoga County in July 2010 and February 2011 — that is, shortly after each of the checks was written. A former promoter for the company testified that she operated it with a partner, that ringside seats and tables were often available at boxing events for much higher prices than those charged for general admission tickets, and that $1,200 would likely have represented the price of a ringside table at the July 2010 event. Although she stated that local organizations sometimes sponsored boxing events and that their names were used in related advertisements and public relations materials, she did not recall that SEARCO had ever acted in such a capacity. Further, she stated that although boxers sometimes had their own separate sponsors, such sponsorships had nothing to do with Pugnacious Promotions.
Defendant contends that there was no proof that any of the transactions were unauthorized and, thus, that defendant had the necessary intent to steal funds from SEARCO. As defendant notes, "[i]n a prosecution for larceny by embezzlement, it is a defense 'that the property was appropriated under a claim of right made in good faith'" (People v Brown, 107 AD3d 1145, 1146 [2013], lv denied 22 NY3d 1039 [2013], quoting Penal Law § 155.15 [1]). [*5]Nevertheless, "[l]arcenous intent . . . is rarely susceptible of proof by direct evidence, and must usually be inferred from the circumstances surrounding the defendant's actions" (People v Brown, 107 AD3d at 1146 [internal quotation marks and citation omitted]). We note that defendant and Piche were SEARCO's only senior officers and the only persons with the power to authorize the use of SEARCO funds. Considered in the light most favorable to the People, the evidence provided a valid line of reasoning and permissible inferences from which the jury could rationally have found beyond a reasonable doubt that defendant committed grand larceny in the third degree by intentionally misappropriating more than $3,000 in SEARCO funds for his own benefit rather than for union purposes (see People v Brown, 107 AD3d at 1146-1147; People v Bisner, 260 AD2d 665, 667-668 [1999], lv denied 93 NY2d 1014 [1999]; People v Clark, 122 AD2d 389, 391-392 [1986], lv denied 68 NY2d 913 [1986]). Further, viewing the evidence in a neutral light and giving deference to the jury's credibility assessments, the verdict was not against the weight of the evidence (see People v Brown, 107 AD3d at 1147; see generally People v Bleakley, 69 NY2d 490, 495 [1987]).
Defendant next contends that his right to a fair and impartial jury was violated when County Court failed to discharge a grossly unqualified juror. After the jury had been impaneled and the People's first witness had testified, juror No. 6 advised County Court that his nephew and his nephew's wife were employed as correction officers at the Rennselaer County Jail. Upon further inquiry, the juror stated that he did not see these relatives often and had not seen them recently, had no plans to see them in the next week and had never discussed the case with them. Defendant contends that the juror should have been disqualified based upon the juror's responses to County Court's first two questions about the effect of this relationship upon his impartiality. First, when the juror was asked whether he believed that the fact that his relatives worked at the jail would prevent him from being fair and impartial, he responded, "Yeah, they both work there." He was then asked whether he thought that he would be prevented from being fair and impartial — and responded, "Yes, I do."
However, each and every one of the juror's subsequent statements affirmed his impartiality. When asked how his ability to be fair and impartial would be affected, the juror answered, "I don't know how it would. I don't think it would." Likewise, when the court asked whether the relationship was going to affect him or not, he said, "No, it's not." The juror then affirmed that he could "make that promise to the [c]ourt and to the parties" and repeated his prior assurances that he had not discussed the case with his relatives or spoken with them recently and knew nothing about the case other than what he had heard in the courtroom. He further confirmed unequivocally that he could set aside his family relationship and decide the case based upon the evidence and the proven facts, and that he could apply the law as given to him. Based upon the juror's assurances of impartiality, the court declined to discharge him.[FN3]
Despite the belated nature of the juror's revelation, "concealment of any information during voir dire is [not] by itself cause for automatic reversal" of a refusal to discharge a sworn juror (People v Rodriguez, 100 NY2d 30, 34 [2003]). Nor is it clear that any actual concealment occurred; the record suggests that the juror may not have heard all of the voir dire questions [*6]pertaining to the Rensselaer County Jail. Much of this questioning took place during voir dire of a second panel of jurors after the first seven jurors — presumably including juror No. 6 — had already been selected from the first panel and excused for the remainder of the day. Notably, when the juror was asked why he had not disclosed the relationship during voir dire, he responded, "[A]ll you discussed was unions."
A prospective juror may be excused for cause because of "a state of mind that is likely to preclude him [or her] from rendering an impartial verdict" (CPL 270.20 [1] [b]), but disqualification of a sworn juror requires a higher standard. At this juncture, the record must reveal "an obviously partial state of mind" and "convincingly demonstrate that the sworn juror cannot render an impartial verdict" (People v Spencer, 29 NY3d 302, 309, 310 [2017]; see People v Buford, 69 NY2d 290, 298 [1987]; People v Cridelle, 112 AD3d 1141, 1146 [2013]). No such demonstration was made here. Read within the context of the entire colloquy, the juror's initial negative responses may instead reasonably be understood to result from misunderstanding of the questions, which were phrased in a compound form. Thereafter, the juror unequivocally affirmed his ability to put the relationship aside and render a fair and impartial verdict. County Court's questions about the nature of the juror's relationship with his relatives constituted the requisite "probing and tactful inquiry" (People v Buford, 69 NY2d at 299), and, upon review, we do not find the refusal to discharge the juror to be an abuse of discretion (see People v Parrilla, 27 NY3d 400, 405 [2016]; People v Peele, 73 AD3d 1219, 1220 [2010], lvs denied 15 NY3d 893, 894 [2010]; People v Mason, 299 AD2d 724, 725 [2002], lv denied 100 NY2d 564 [2003]).
We find no merit in defendant's contention that he was deprived of a fair trial by two comments during the prosecutor's summation. Nothing in the first challenged comment improperly shifted the burden of proof to defendant to demonstrate that his expenditures were authorized (see People v Barber, 13 AD3d 898, 900 [2004], lv denied 4 NY3d 796 [2005]; People v Townsley, 240 AD2d 955, 958-959 [1997], lvs denied 90 NY2d 943, 1014 [1997]), and the prosecutor's remarks regarding the jury's responsibility to decide whether defendant made the expenditures for his own benefit or that of SEARCO were fair responses to defendant's argument that it was not the jury's role to decide whether the expenditures were proper (see generally People v Wynn, 149 AD3d 1252, 1256 [2017], lv denied 29 NY3d 1136 [2017]; People v Pine, 82 AD3d 1498, 1502 [2011], lv denied 17 NY3d 820 [2011]).
Finally, defendant challenges the amount of the restitution award. At the hearing, the People relied upon the testimony of an investigator from the State Police Financial Crimes Unit, who described the detailed process by which investigators excluded all debit card expenditures that could be related to SEARCO activities and determined that $5,979.14 in unexplained expenditures remained. He further testified that SEARCO's bank records revealed $5,000 in cash withdrawals, that none of this amount was shown to be related to any SEARCO purpose, and that Piche had told investigators that cash was not used to conduct union business [FN4]. This evidence was sufficient to establish the amount of the loss on a prima facie basis, shifting the burden of going forward to defendant "to offer evidence contradicting the People's calculation" (People v Tzitzikalakis, 8 NY3d 217, 221 n 2 [2007]; accord People v Decker, 139 AD3d 1113, 1118 [2016], lv denied 28 NY3d 928 [2016]). Defendant's argument that the People failed to exclude [*7]the possibility that some of the expenditures were legitimate does not constitute such evidence. County Court properly determined the amount of the award (see People v Ortiz, 148 AD3d 1291, 1293 [2017]; People v Stevens, 84 AD3d 1424, 1427 [2011], lv denied 17 NY3d 822 [2011]).
Clark, Mulvey, Aarons and Rumsey, JJ., concur.
ORDERED that the judgment is affirmed, and matter remitted to the County Court of Rensselaer County for further proceedings pursuant to CPL 460.50 (5).



Footnotes

Footnote 1: Defendant was acquitted of two other charges, and one was dismissed before trial.

Footnote 2: Defendant also served as SEARCO's treasurer for an unspecified period. The third individual was named as SEARCO's secretary, but never took an active role in the union's operations or finances.

Footnote 3: It bears noting that, out of the juror's presence, defense counsel informed County Court that one of the relatives may have taken over the management of SEARCO after Piche and defendant left their posts. Nonetheless, absent any indication that the juror knew of such a connection, this possibility does not alter our determination.

Footnote 4: The witness also testified that the Pugnacious Promotions checks were not shown to be related to any SEARCO purpose, but County Court excluded the checks from the award, finding that the hearing testimony did not prove that defendant himself benefitted from the full amount of those funds.